AO 91 (Rev. 08/09) Criminal Complaint

SEALED

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Texas

| | |
|---|---|
| United States of America<br>v.<br>Vivian Adiza Yusuf;<br>Date Of Birth: 07/22/1970 | Case No.<br>6:11mj18 |
| *Defendant(s)* | |

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS
FEB 16 2011
DAVID J. MALAND, CLERK
BY
DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __April 10, 2008__ in the county of __Smith__ in the __Eastern__ District of __Texas__, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18 U.S. Code Section 1347 | Health Care Fraud |

This criminal complaint is based on these facts:
See attached Affidavit in Support of Criminal Complaint.

☑ Continued on the attached sheet.

*Complainant's signature*

James A. Wilson, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __02/16/2011__

*Judge's signature*

City and state: __Tyler, Texas__   John D. Love, United States Magistrate Judge
*Printed name and title*

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1. This Affidavit in Support of Criminal Complaint is presented as an attachment to a Criminal Complaint seeking a federal arrest warrant for Vivian Adiza Yusuf, Date of Birth 07/22/1970, for a violation of Title 18 United States Code Section 1347 - Health Care Fraud.

2. The information being provided in this Affidavit in Support of Criminal Complaint is being sworn to by James A. Wilson, Special Agent (SA) with the Federal Bureau of Investigation (FBI), Dallas Division, Tyler, Texas Resident Agency. SA Wilson has been employed as an FBI SA since July 1992, and since that time has investigated a number of violations of federal law, including health care fraud violations.

3. The investigation of allegations of Health Care Fraud by Vivian Adiza Yusuf has been conducted by the FBI, the State of Texas Office of Attorney General - Medicaid Fraud Control Unit (MFCU), and the United Stated Department of Health and Human Services - Office of Inspector General (HHS-OIG). Information provided in this Affidavit in Support of Criminal Complaint has been compiled from information provided by each of the agencies listed above. The information provided in this affidavit is in summary form, and is not intended to represent all of the information gathered in the investigation. The information provided in this affidavit is true and correct to the best of my knowledge.

**BACKGROUND**

4. The Medicare Program (Medicare) is a federal health care program providing benefits to persons who are over the age of sixty-five and some persons under the age of sixty-five who are blind or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency under the United States Department of Health and Human Services (HHS). Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

5. Medicare is a "health care benefit program, as defined by Title 18, United States Code, Section 24(b), in that it is a public plan affecting commerce under which medical benefits, items, and services are provided to individuals and under which individuals and entities who provide medical benefits, items, or services may obtain payments.

6. The Medicare program includes a voluntary supplemental insurance benefit known as Part B, which is funded from insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. Part B of the Medicare program covers most out-patient services, including durable medical equipment (DME). DME is equipment that may be used in the home on a repeated basis for a medical purpose. DME suppliers who meet certain criteria may obtain Medicare provider numbers, which allowed them to submit claims directly to Medicare in order to receive reimbursement for the cost of DME supplied to eligible Medicare beneficiaries.

7. DME companies are prohibited from receiving payments for items or services:

   a. That are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member or which are not reasonable and necessary for the prevention of illness,

   b. For which the individual furnished such items or services has no legal obligation to pay and which no other person has a legal obligation to provide or pay for,

   c. That constitute personal comfort items, or

   d. Where such items are for custodial care.

8. It is the obligation of the health care providers, including DME companies, to assure that services or items:

   a. Are provided economically and only when, and to the extent, medically necessary, and

   b. Are supported by evidence of medical necessity.

9. The United States provides reimbursement for Medicare claims through CMS. CMS contracts with private insurance organizations, referred to as "carriers" under Part B, to receive, adjudicate, and pay Medicare claims submitted by approved and participating health care providers. These carriers are required to administer the Medicare program according to regulations established by CMS. There are four regional carriers, known as Durable Medical Equipment Regional Carriers (DMERCs), who are responsible for processing claims for DME reimbursement.

10. Medicare Part B covered services must be submitted by a provider or supplier to the appropriate regional carrier based upon the beneficiary's state of residence. Medicare Part B reimburses suppliers directly for the cost of equipment provided to eligible Medicare beneficiaries provided that such equipment was ordered by a licensed physician who certified that the equipment was medically necessary for the beneficiary. Such physician certifications could be in the form of a physician's order or a certificate of medical necessity (CMN). A CMN is a form created by Medicare which is valid only if it is signed by a physician and certifies to the medical necessity of the DME prescribed. Medicare regulations require DME suppliers to maintain these physician's orders and certificates of medical necessity on file at their companies.

11. In order to become a supplier authorized to bill Medicare for DME, a company is required to submit a Medicare Enrollment Application to CMS via the National Supplier Clearinghouse (NSC). The NSC contracts with Medicare to receive, evaluate, and approve or deny Medicare Enrollment Applications. In this application, potential suppliers promise to comply with all Medicare-related laws and regulations. Only after the NSC approves an application and provides a company with a Medicare supplier number may a company bill Medicare for benefits, items, and services provided to Medicare beneficiaries.

12. In order to receive payment from Medicare, the supplier is required to submit a health insurance claim form (Form HCFA 1500) to Medicare. The claim form is required to state, among other things, the beneficiary's name and health insurance claim number

(HICN), the Healthcare Common Procedural Code Systems (HCPCS) code corresponding to the DME provided to the Medicare beneficiary, the date the DME was provided, the charge for the DME, and the name and Unique Physician Identification Number (UPIN) or National Provider Identifier (NPI) number of the referring physician or other health care provider who ordered or prescribed the services. All information contained in the form must be true, accurate, and complete. The claim form can be submitted on paper or in electronic format.

13. Medicare has specific guidelines for the billing and coverage of DME and supplies. These guidelines are published in a manual provided to all new DME suppliers and is updated four times a year. The manual is made available to Medicare suppliers in both computer CD-ROM and paper format. It is also publically-available and accessible on the internet.

14. DME suppliers sign an agreement with Medicare in which they state that they were familiar with Medicare's billing requirements and in which they promise not to submit false or fraudulent claims. Medicare requires DME suppliers to retain records for a period of six years and three months.

15. A supplier may contract with a billing company to prepare and transmit claims to Medicare on its behalf. All payments made by Medicare are made to a provider in the form of a United States Treasury check or a pre-arranged direct deposit into the provider's bank account.

16. By way of example, under Medicare rules, Medicare Part B pays for the cost of medically necessary orthotic braces and equipment when supplied to a beneficiary if the beneficiary has a debilitating medical condition which could be improved by the use of an orthotic brace, and the need for the orthotic brace was documented by a licensed physician or approved medical practitioner in the form of a physician's order or, in some cases, a CMN.

17. In order for a DME supplier to be paid for providing an orthotic brace to a beneficiary, Medicare requires the supplier to obtain documentation that the orthotic brace was medically necessary. Although no specific document outside of a physician's order is required to support the patient's medical need for the equipment, the patient's treating physician is required to assess the patient's need for and potential benefit from an orthotic brace.

**THE DEFENDANT AND THE SCHEME**

18. Vivian Adiza Yusuf, date of birth 07/22/1970, formed Ivy Healthcare Supply, Inc. (Ivy), in Houston, Texas in about 2007. Ivy was in the business of supplying DME to Medicare beneficiaries. Yusuf was the owner/manager of Ivy, as well as Tibhor Healthcare and Yusuf Medical Supplies.

19. Yusuf devised and carried out a scheme to defraud Medicare through the submission of claims for medical equipment and supplies which were not medically necessary, and were

not prescribed or otherwise authorized by a physician, and for which Ivy was not entitled to reimbursement.

20. Yusuf traveled from her home in Houston, Texas, to Tyler, Texas on or around April 10, 2008, to carry out acts in furtherance of this scheme. On April 8, 2008, Ernestine Italiano, 72 years old, received a phone call from a woman identifying herself as "Carolyn," who stated that she was a representative of a DME company. "Carolyn" asked Italiano if she could come to her home and deliver DME. Italiano told her no, asked not to be bothered again, and reported the incident to the Tyler MFCU office.

21. On April 10, 2008, Italiano received a phone call from a woman named "Vivian" who identified herself as a representative of Ivy and asked if she could come by her home that day and get her to sign some medical forms. Italiano believed that this call was from the same person who had called earlier identifying herself as Carolyn. Italiano told the woman she could come by and immediately contacted MFCU investigators.

22. MFCU investigators met with Italiano at her home prior to arrival of Ivy representatives. While MFCU investigators were at the home, Yusuf and another individual arrived at Italiano's residence. Yusuf stated to investigators that they were at Italiano's residence to deliver DME items to Italiano, yet they had no items for her. Yusuf attempted to have Italiano sign papers authorizing Ivy Healthcare to bill DME to her Medicare account. Yusuf stated that she had consulted with Italiano's physician who had ordered the DME, verified with him the DME items herself, but was unable to remember the physician's

name or specific DME ordered.

23. Italiano told Yusuf in the presence of MFCU investigators that she did not want anything from Ivy, that she did not want Ivy to contact her or come to her home again, and that Ivy should not bill anything to her Medicare account.

24. However, Medicare Claims records show that Ivy represented to Medicare that DME items had been provided to Italiano on August 13, 2007, eight months prior to the visit at Italiano's residence. These records also show that Ivy submitted two separate claims to Medicare for DME for Italiano around that time, and was paid $6,132.20 for those claims. On or about April 27, 2008, about two weeks after the visit to Italiano's residence, Ivy billed Medicare twice more for DME totaling $9,700. An additional claim for DME for Italiano was submitted to Medicare by Ivy on May 2, 2008. Medicare denied payment for the last three claims submitted by Ivy for Italiano. Further investigation shows that Italiano did not receive any DME items from Ivy whatsoever.

25. Investigation shows that Ivy billed Medicare for 790 patients totaling $3,401,294 and was paid $1,629,368 for these services between August 2007 to April 2009. During that time period, Ivy billed Medicare for services allegedly provided to twenty deceased beneficiaries.

26. On 01/12/2011, Yusuf was provided with three Federal Grand Jury subpoenas by HHS-OIG requiring her to produce records pertaining to Ivy Health Care Supply, Tibhor

Healthcare, and Yusuf Medical Supplies to the Federal Grand Jury in Tyler, Texas on 02/02/2011. These subpoenas were presented to Yusuf in the presence of her attorney, Baba Adio, in Houston, Texas. These subpoenas directed Yusuf to produce records dated 01/01/2007 to the present which are required to be maintained by Medicare providers. Neither Yusuf nor her attorney acting on her behalf has complied with these subpoenas, nor have they made contact with HHS-OIG or the United States Attorney's office in Tyler regarding this matter.

27. The information provided above provides probable cause to believe that Vivian Adiza Yusuf, Date of Birth: 07/22/1970, knowingly and willfully executed a scheme to defraud Medicare (a health care benefit program) and obtained, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody of control of Medicare, in connection with the delivery of or payment for health care benefits, items, or services in violation of Title 18, United States Code, Section 1347 - Health Care Fraud.

_____
James A. Wilson
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 16th day of February, 2011.

_____
John D. Love
United States Magistrate Judge